UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

PASCAL ABIDOR, et al.

Plaintiffs,

v.

JANET NAPOLITANO, et al.

Defendants

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action
No. 10 CV 4059

(Korman, J.)
(Azrack, M.J.)

---

**REPLY IN SUPPORT OF MOTION TO DISMISS**

Plaintiffs challenge two Department of Homeland Security policies that permit, subject to certain restrictions, border searches of laptops and other electronic devices without suspicion. As Defendants demonstrated in their initial brief, Plaintiffs' facial challenge to the Defendants' policies should be dismissed for lack of standing. Plaintiffs' bald assertion that their electronic devices are "likely" to be searched in the near future is pure speculation, and fails to demonstrate the concrete and imminent injury necessary to establish standing. Moreover, all of Plaintiffs' claims should be dismissed for failure to state a claim. Plaintiffs' Fourth Amendment claim has no merit, and fails to properly acknowledge the Government's well-established broad search authority at the border. Recognizing that electronic devices are similar to luggage and other closed containers, courts have repeatedly held that customs officials are entitled to inspect the contents of any such items without showing particularized suspicion. Plaintiffs' First Amendment claim likewise lacks merit, as it is contrary to case law holding that an otherwise valid border search does not violate the First Amendment simply because the search uncovers expressive materials.

## I.  PLAINTIFFS LACK STANDING FOR FACIAL CHALLENGE TO THE POLICIES.

Plaintiffs' professed fears that they will likely be subject to future searches of their electronic devices are purely speculative. Def. Mem. 14-18, ECF No. 15. Indeed, their alleged fears that they will be subjected to such searches in the future is belied by their own allegation that only 6,500 persons were subject to searches of their electronic devices between October 1, 2008, and June 2, 2010. Compl. ¶ 1, ECF No. 1. Assuming that all of these searches occurred on inbound travels, there was only one such search for every 90,000 inbound travelers; in other words, approximately 0.0011% of the travelers were subject to this type of search at the border. Def. Mem. at 16.

Plaintiffs try to deny the speculative nature of their claims by arguing that the existence of an official policy distinguishes this case from *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983).

Pl. Opp. 13 n.2, ECF No. 17. But as the Second Circuit explained, "the existence of an official policy, on its own," is not "sufficient to confer standing to sue on any individual who had previously been subjected to that policy." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004). Instead, "a plaintiff seeking injunctive relief must demonstrate <u>both</u> a likelihood of future harm <u>and</u> the existence of an official policy or its equivalent." *Id.* (emphases in original).[1]

The Second Circuit's recent decision in *Amnesty Int'l, USA v. Clapper*, No. 09-4112-cv, 2011 WL 941524 (2d Cir. March 21, 2011), *rev'g Amnesty Int'l, USA v. McConnell*, 646 F. Supp. 2d 633 (S.D.N.Y. 2009), does not hold otherwise. While the Second Circuit found that the existence of a policy may "bolster[] a plaintiff's argument that the injury is likely to come to pass," it did not find that the mere existence of the policy was sufficient to confer standing. *Id.* at *14. The plaintiffs in that case challenged the constitutionality of new statutory provisions authorizing the government's electronic surveillance targeting certain non-U.S citizens outside the United States. The Second

---

[1] Abidor attempts to make his fear of future searches of his electronic devices appear less speculative by noting that, when he entered the United States on December 22, 2010, he was subject to, what he characterizes as, another border search. *See* Exhibit A to Pl. Opp. His reliance on this incident, however, is misplaced because CBP did not search any electronic devices during that encounter. Declaration of Charles Allen ¶¶ 9-11 (attached as Exhibit A). If anything, this incident demonstrates that his fear of future border searches of his electronic devices is purely speculative. Indeed, this is the second incident mentioned by Abidor that demonstrates the speculative nature of his allegations. He acknowledged in the Complaint that his electronic devices were not searched when he returned from Europe in July 2010. Compl. ¶ 58. Abidor also argues that he has standing because he seeks expungement of information he believes DHS may have retained from the May 2010 border search of his laptop. Pl. Opp. at 18. While the alleged injury may arguably confer standing for his separate challenge to that particular search (Compl. ¶¶ 130-131), it does not confer standing to raise a facial challenge to the policies or seek to enjoin the policies. A plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of Earth v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 185 (2000); *accord Lyons*, 461 U.S. at 109 (although plaintiff had standing to pursue damages, he lacked standing for injunctive relief); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[S]tanding is not dispensed in gross").

Circuit held that the plaintiffs had standing because it was undisputed that the plaintiffs were in communication "with precisely the sorts of individuals that the government will most likely seek to monitor," *e.g.*, persons suspected "to be associated with terrorist organizations." *Id.* at *15. The Second Circuit stressed that "[c]onferring standing on these plaintiffs is not tantamount to conferring standing on any or all citizens who no more than assert that certain practices of law enforcement offices are unconstitutional." *Id.* As the court noted, "[m]ost law-abiding citizens have no occasion to communicate with suspected terrorists; relatively few Americans have occasion to engage in international communications relevant to 'foreign intelligence.'" *Id.*

Plaintiffs here have not made the type of showing that was made in *Amnesty Int'l, USA v. Clapper*. The challenged policies here do not target anyone. As a result, Plaintiffs are not part of, or associated with, a narrow class of persons targeted by a policy. Instead, Plaintiffs are simply among the hundreds of million people who cross the border into the United States each year (*see* Decl. of Troy Riley ¶ 4, ECF 15-5), and Plaintiffs' own statistics show that only approximately 0.0011% were subject to this type of search at the border.[2]

Plaintiffs dismiss their own statistics by asserting that even a small probability of injury is sufficient to establish standing provided "that the relief sought would, if granted, reduce the probability." Pl. Opp. at 14. To support this assertion, Plaintiffs rely on decisions involving

_____

[2] Plaintiffs seek to avoid this defect by asserting that they are "part of the class of international travelers." Pl. Op. at 14. But the cases cited in support of this contention are distinguishable, for two reasons. First, the decisions relied upon by Plaintiffs involved policies that required, not merely authorized, government conduct, *i.e.*, drug testing. Second, such decisions involved much narrower classes than the hundreds of millions of individuals who cross the border each year. *Cronin v. FAA*, 73 F.3d 1126 (D.C. Cir. 1996) (employees in safety-related aviation positions); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362 (D.C. Cir. 1990) (employees of federally-funded mass transit agencies in safety-related positions).

environmental and health injuries. *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003) (challenge to USDA's denial of petition to ban use of downed livestock as food for human consumption); *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) (challenge to rule allowing use of methylbromide); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006) (challenge to decision to permit oil and gas drilling in a portion of a national park). However, those decisions are inapposite. First, in each of those decisions, there was no dispute that the challenged action itself had or was about to take place. Instead, the issue was the probability that the challenged action would cause harm. In this case, by contrast, Plaintiffs' allegation that their electronic devices will be subjected to future searches is speculative.[3] Second, cases finding that a small probability of harm might be sufficient to establish an injury have been limited to situations involving alleged harm to health or the environment. For example, in *Baur*, the Second Circuit expressly limited its holding to "the specific context of food and drug safety suits." 352 F.3d at 634 (emphasis added). *Accord Ctr for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005); *NRDC v. EPA*, 464 F.3d at 6; *Nat'l Council of La Raza v. Gonzales*, 468 F. Supp. 2d 429, 440 (E.D.N.Y. 2007), *aff'd* 283 F. App'x. 848 (2d Cir. 2008). Here, by contrast, Plaintiffs claim no harm to health or the environment; they raise

---

[3] Plaintiffs' argument that large membership organizations suing on behalf of their members need only show that "at least one of its members" has standing in his or her own right (Pl. Opp. at 15) ignores the fact that neither NPPA nor NACDL has made that showing here. Unlike NPPA's and NACDL's speculative fear that some of its members may have their electronic devices searched in the future, in *Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 146 (2d Cir. 2006), the organization alleged that some members had been exposed to contaminated soil while working at certain sites and other members drank water from public water supplies drawn from a polluted lake. In *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), the court found that there was a realistic danger that at least one of the members of the organizations would have his or her voter application rejected due to a mistaken mismatch where the organizations collectively had around 20,000 members and the state itself estimated that there would be a one percent chance that an application would be rejected because of a mismatch of identity.

constitutional challenges to actions taken by an Executive Branch agency. A court's standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

Finally, Plaintiffs attempt to show injury by alleging that they have altered their behavior due to the speculative possibility that their electronic devices may someday be subject to a border search. Pl. Opp. at 17. But as explained in Def. Mem. at 17, where, as here, there is no reasonable likelihood of future harm to Plaintiffs, "they cannot bootstrap their way into standing" by changing their behavior "to avoid a merely speculative or highly unlikely potential harm." *Amnesty Int'l*, 2011 WL 941524, *11. *Accord Laird v. Tatum*, 408 U.S. 1, 14 (1972); *see also White v. United States*, 601 F.3d 545, 554 (6th Cir. 2010); *Nat'l Council of La Raza v. Gonzales*, 468 F. Supp. 2d at 443-44.

None of the cases cited by Plaintiffs hold otherwise.[4] In *Friends of Earth v. Laidlaw Envtl. Serv., Inc.*, the plaintiffs were found to have standing to challenge the discharge of pollutants into a river near their home because it "curtail[ed] their recreational use of that waterway and would subject them to other economic and aesthetic harms." 528 U.S. at 184. There was no dispute that the discharges had taken place and had polluted the river. *Id.* Instead, the issue was whether the pollutants reasonably supported the plaintiffs' fear of injury to their health. *Id.* Similarly, in *Ozonoff v. Burzak*, 744 F.2d 224, 229 (1st Cir. 1984) (Breyer, J.), the plaintiff challenged a law barring him from seeking employment unless he underwent a loyalty check. In *Presbyterian Church v. United*

---

[4] Indeed, *Williams v. Town of Greenburgh*, 535 F.3d 71 (2d Cir. 2008), did not even address a standing issue. Instead, the language regarding chilling effect was made in the context of deciding whether the defendant's action in barring plaintiff from a community center had violated his First Amendment rights.

*States*, 870 F.2d 518 (9th Cir. 1989), churches claimed that their constitutional rights had been violated when INS agents surreptitiously recorded church services. Unlike here, the churches did not base their injury on fears that they may be subject to the alleged illegal practice. Instead, they alleged that they suffered a current injury, namely a decrease in attendance at the services, because the surveillance had deterred its members from attending. Accordingly, none of the cases support Plaintiffs' claim to standing, and this Court should dismiss Plaintiffs' facial challenge to the policies for lack of standing.

## II. THE POLICIES DO NOT VIOLATE THE CONSTITUTION ON THEIR FACE.

As Defendants have demonstrated, in order to invalidate the challenged policies on their face, Plaintiffs must shoulder a heavy burden. Def. Mem. at 18. Plaintiffs "'must establish that no set of circumstances exists under which the [policies] would be valid.'" *Reno v. Flores*, 507 U.S. 292, 301 (1993) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also New York State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 171 (2d Cir. 2001). Plaintiffs do not dispute that they bear this burden and do not contend, even in conclusory form, that they have met this burden. For this reason alone, their challenge to the policies should be rejected.

### A. The Policies Do Not Violate the Fourth Amendment.

1. Border Searches of Electronic Devices: Plaintiffs' claim that border searches of electronic devices require reasonable suspicion has no merit. Recognizing that electronic devices are similar to luggage and other closed containers, courts have repeatedly held that customs officers are entitled to inspect the contents of such devices without showing particularized suspicion. *See, e.g., United States v. Arnold*, 533 F.3d 1003, 1007 (9th Cir. 2008), *cert. denied*, 129 S.Ct. 1312 (2009); *United States v. Linarez-Delgado*, 259 F. App'x. 506, 508 (3d Cir. 2007); *United States v. Irving*, No. 03-cr-

6

633, 2003 WL 22127913, at *5 (S.D.N.Y. Sept. 15, 2003), *aff'd*, 452 F.3d 110 (2d Cir. 2006);

*Cancel-Rios v. United States*, No. 10-1386, 2010 WL 3420805, at *3 (D.P.R. Aug. 30, 2010);*United*

*States v. Veema*, No. H-08-699-1, 2010 WL 1427261, *2-*3 (S.D. Tex. Apr. 8, 2010); *United States*

*v. Bunty*, 617 F. Supp. 2d 359, 365 (E.D. Pa. 2008); *United States v. McAuley*, 563 F. Supp. 2d 672,

679 (W.D. Tex. 2008); *United States v. Pickett*, Criminal Action No. 07-374, 2008 WL 4330247,

*3-*4 (E.D. La. Sept. 16, 2008), *aff'd*, 598 F.3d 231 (5th Cir. 2010); *United States v. Hampe*, Crim.

No. 07-3-B-W, 2007 WL 1192365, at *4 (D. Me. Apr. 18, 2007) (Report and Recommendation),

*adopted*, 2007 WL 1806671 (D. Me. June 19, 2007).

Plaintiffs offer no valid basis for this Court to depart from this long line of authority. Instead,

Plaintiffs simply recycle the same arguments rejected in *Arnold* and the other cases. Plaintiffs argue

that searches of electronic devices should be considered "non-routine" searches requiring reasonable

suspicion because electronic devices, unlike other closed containers, (1) can store personal and

expressive information; (2) have a vast storage capacity; and (3) have become a commonplace part

of daily life. Pl. Opp. at 21-25.[5]

Plaintiffs' argument is fundamentally flawed. As an initial matter, the distinction that

---

[5] Plaintiffs also try to support their claims by asserting that searches of electronic devices "are inherently offensive in manner" because they "contain vast quantities of deeply personal and sensitive information." Pl. Op. at 26 (citing *United States v. Ramsey*, 431 U.S. 606 (1957)). But in *Ramsey*, the Court left open the question of whether a border search is unreasonable "because of the particularly offensive manner in which it is carried out." *Id.* at 618 n. 13. *Ramsey* spoke of the *manner* in which the search is conducted, *i.e.*, the method or methods used to carry out the search. Plaintiffs, by contrast, focus on the *object* of the search, *i.e.*, a computer. Plaintiffs contend that a search of a computer is by its very nature particularly offensive, regardless of the manner in which the search is conducted. Thus, *Ramsey* in no way supports Plaintiffs' contention. The only other decision cited by Plaintiffs in support of this contention, *Kremen v. United States*, 353 U.S. 346 (1957), is likewise inapposite. *Kremen* involved a warrantless search of a residence, not a border search of a computer or any other object.

Plaintiffs seek to draw between "routine" and "non-routine" border searches has no application to *non-destructive* searches of property. Def. Mem. at 19. While the Supreme Court has characterized a narrow category of *personal* searches, "such as strip, body cavity, or involuntary x-ray searches[,]" as "non-routine" and thus requiring reasonable suspicion, *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 n.4 (1985) (emphasis added), the Supreme Court has rejected attempts to extend this exception beyond "highly intrusive searches *of the person.*" *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004) (emphasis added). Plaintiffs attempt to evade this limitation by asserting that *Flores-Montano* "specifically limited its holding to vehicles." Pl. Opp. at 22. However, Plaintiffs offer no support for their reading of *Flores-Montano*. Indeed, they cannot. While *Flores-Montano* happened to involve a vehicle, the Court used the term "property" without qualification when discussing the scope of its ruling. *See, e.g.,* 541 U.S. at 155-56 ("while it may be true that some searches of property are so destructive as to require a different result, this was not one of them"). Lower courts have interpreted *Flores-Montano* as requiring reasonable suspicion only for non-routine border searches of persons. *Rahman v. Chertoff*, 530 F.3d 622, 624 (7th Cir. 2008) (holding only "stops that entail intrusive searches of the body are in a special category"); *United States v. Chaudhry*, 424 F.3d 1051, 1054 (9th Cir. 2005) ("the distinction between 'routine' and 'non-routine' searches . . . was specifically limited to searches of the person").[6]

Moreover, the arguments made by Plaintiffs to distinguish electronic devices from other closed containers do not withstand scrutiny. Plaintiffs' suggestion that border searches of electronic

---

[6] Contrary to Plaintiffs' suggestion (Pl. Opp. at 18), nothing in *Tabbaa v. Chertoff*, 509 F.3d 89, 98 (2d Cir. 2007), suggests that some property searches may be non-routine. In *Tabbaa*, plaintiffs' claims centered on border searches and detention of persons, namely that they had been patted down, finger-printed, photographed and detained without reasonable suspicion. *Id.*

devices should be subject to a reasonable suspicion standard because the devices may contain expressive material (Pl. Opp. at 24-25) ignores the fact that luggage and other containers may also contain expressive materials such as films, photographs, and personal correspondence. *See United States v. Thirty Seven Photographs*, 402 U.S. 363, 365 (1971) (search of luggage containing 37 allegedly obscene photographs); *United States v. 12 220-Ft. Reels of Super 8mm Film*, 413 U.S. 123, 125 (1973) (border search finding "movie films, color slides, photographs, and other graphic materials"); *United States v. Seljan*, 547 F.3d 993 (9th Cir. 2008) (en banc) ("an envelope containing personal correspondence is not uniquely protected at the border"); *United States v. Borello*, 766 F.2d 46, 58-59 (2d Cir. 1985) ("opening of the cartons and the screening of films were plainly permissible" in a border search).[7] Indeed, courts have specifically rejected claims that reasonable suspicion should be required for border searches of electronic devices because they may contain expressive material. *See Arnold*, 533 F.3d at 1010; *United States v. Ickes*, 393 F.3d 501, 507 (4th Cir. 2005).

Plaintiffs' argument that electronic devices should be treated differently because they can store personal information (such as emails, photographs and tax returns) is similarly flawed. This argument ignores the fact that other containers can contain hard copies of the very same type of

---

[7] In an attempt to find some support for their position, Plaintiffs assert that the Supreme Court "suggest[ed] that the 'full panoply of Fourth Amendment requirements" might be applicable where the government searches implicate expressive rights or threaten to 'chill' expressive conduct." Pl. Opp. at 25 (citing *United States v. Ramsey*, 431 U.S. at 624 n. 8). In fact, the Supreme Court simply stated that it did not need to reach that issue. None of the other cases cited by Plaintiffs to support their claim that expressive materials are entitled to greater protection at the border involved border searches. *See, e.g., Roaden v. Kentucky*, 413 U.S. 496 (1973) (seizure of sexually explicit film at a drive-in); *United States v. U.S. Dist. Court for the Eastern. Dist. of Mich.*, 407 U.S. 297 (1972) (electronic surveillance requires a warrant); *Stanford v. Texas*, 379 U.S. 485 (1965) (scope of a search warrant for materials in a home).

private information – including diaries, photographs, love letters, day planners, names and addresses of associates, business and membership cards, meeting notes, medical records, and personal reading materials. *See United States v. McAuley*, 563 F. Supp. 2d at 678. There is no valid reason why private materials in a computer should be categorically immune from border searches, when those same materials may be searched without reasonable suspicion when stored in luggage, briefcases, and other containers. Plaintiffs, in effect, wish to have the suspicion required for a border search depend on the form in which the document is kept. Under Plaintiffs' approach, the level of privacy travelers enjoy in their personal information would depend on the happenstance of whether that data is reproduced with ink and paper or stored in a computer. This approach ignores and runs contrary to court holdings that the Fourth Amendment affords "'neither a heightened nor a reduced level of protection for information stored on computers.'" *United States v. D'Amico*, 734 F. Supp. 2d 321, 366 (S.D.N.Y. 2010) (quoting *United States v. Vilar*, No. S305CR621, 2007 WL 1075041 at *36 (S.D.N.Y. April 4, 2007)); *accord United States v. McAuley*, 563 F. Supp. at 672 ("The fact that a computer may take . . . personal information and digitize it does not alter the Court's analysis"). *See also Arnold*, 533 F.3d at 1009 ("the Supreme Court has refused to draw distinctions between containers of information . . . with respect to their quality or nature for purposes of determining the appropriate level of Fourth Amendment protection").

Plaintiffs' suggestion that this Court should carve out a special exception for information contained in a computer would improperly favor certain travelers at the expense of others. Travelers who carry their information in computers would enjoy greater privacy protection than travelers who carry their information in hard copy form. For example, under Plaintiffs' approach, a sexually explicit and exploitive hard copy photograph of a child could be inspected without reasonable

suspicion, but the very same photograph saved as an electronic file on a computer could be inspected only with reasonable suspicion. However, "[t]here is no justification for favoring those who are capable of storing their records on computer over those who keep hard copies of their records." *United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998).

Plaintiffs seek to justify such favoritism by pointing out that computers carry large amounts of information. Pl. Opp. at 20-23. There is no basis in law or in logic for such favoritism based on the fact that computers have vast storage capacity. *See e.g., Arnold*, 533 F.3d at 1009; *McAuley*, 563 F. Supp. 2d at 677-78. Indeed, to adopt such a distinction would mean that the more materials a container may hold, the less constitutional authority a customs officer would have to search it. Such a rule would obviously create an unacceptable adverse consequence to border security. If anything, the potentially unlimited storage capacity of computers weighs heavily in favor of, not against search authority.[8]

Plaintiffs also seek to justify their request for a special status for electronic devices on their assumption that travelers cannot be expected to leave their laptops and other electronic devices at

---

[8] Plaintiffs contend that a search of a computer should be analogized to a search of a residence for Fourth Amendment purposes, because a computer is capable of storing large amounts of personal data, which they claim is typically stored in a residence. Pl. Opp. at 22. This claim has no merit for several reasons. First, the Supreme Court has refused to analogize a motor home to a residence for Fourth Amendment purposes, even if the motor home is capable of functioning as a residence. *See California v. Carney*, 471 U.S. 386, 393-94 (1985) (motor homes included within vehicle exception to Fourth Amendment warrant requirement). Thus, the mere fact that a computer is capable of storing the amount of personal data typically stored in a residence does not justify treating a computer as a residence for Fourth Amendment purposes. Second, Plaintiffs' argument misses an essential point - if an individual were relocating from abroad, and he shipped the contents of his home to the United States, the contents would arrive through a port of entry, where, like any other cargo, the contents would be subject to a border search. *Cf. Thirty-Seven Photographs*, 402 U.S. at 376 (customs officers may seize obscene materials at the border, even though the Constitution prohibits prosecuting the traveler for possessing the materials in his residence).

11

home because they play an important role in daily life. Pl. Opp. at 29-30. But the same can be said for day planners, diaries, books, and any other item that a particular traveler might deem necessary for travel because it serves an important function in that traveler's daily life. The Fourth Amendment was not intended to shield travelers from "inconvenience . . . at the international border." *Flores-Montano*, 541 U.S. at 155 n.3. Likewise, the fact that electronic devices are portable does not distinguish them from other containers brought across the border that are necessarily portable as well. Regardless of how convenient electronic devices may have become in modern life, those who choose to carry such devices have no legitimate, objective expectation that those devices will be allowed to cross the border without any examination of their contents when those same contents in hard copy form would be unquestionably exposed to border searches.[9]

Plaintiffs' request to provide special status for electronic devices also ignores the vital law enforcement and national security interests involved. As the "Nation's first line of defense," *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 668 (1989), customs officers are charged "with protecting this Nation from entrants who may bring anything harmful to this country." *Montoya*, 473 U.S. at 544. *See* Def. Mem. at 3 (description of the various laws enforced by U.S. Customs and Border Protection ("CBP") and U.S. Immigration and Customs Enforcement ("ICE"); *Tabbaa*, 509 F.3d at 103 ("[I]nterception and detection at international border crossings is likely the most effective way to protect the United States from terrorism and instruments of terrorism") (quoting *Tabbaa v. Chertoff*, No. 05-CV-582S, 2005 WL 3531828 at *15 (W.D.N.Y. Dec. 22,

---

[9] Plaintiffs try to refute this point by noting that it may be difficult to erase every forensic trace of "deleted" materials. As with all containers brought across the border, the traveler alone ultimately decides what content the electronic device will store and, more importantly, whether to bring that device, or all of the information stored on it, across the border at all.

2005)). Due to these concerns, courts have rejected attempts to place "imprudent constraint[s]"on

border search authority. *See, e.g., Seljan*, 547 F.3d at 1005 n.9.

Border searches of computers and other electronic devices have become a vital part of border

enforcement. Def. Mem. at 4-5. Some of the most important evidence of illegal activities "is often

found buried in computers." *Vilar*, 2007 WL 1075041 at *36. *Accord, D'Amico*, 734 F. Supp. 2d

at 365. Since computers often contain evidence of illegal activity, it would be counterintutitive to

grant a higher level of protection to computers and those who carry them across the border, as

Plaintiffs would have this Court do. Indeed, courts have noted that requiring reasonable suspicion

for computer searches "effectively would allow individuals to render graphic contraband, such as

child pornography, largely immune to border search simply by scanning images onto a computer disk

before arriving at the border." *Irving*, 2003 WL 22127913, *5; *accord Ickes*, 393 F.3d at 506 (to

"create a sanctuary at the border for all expressive material – even terrorist plans . . . would

undermine the compelling reasons that lie at the very heart of the border search doctrine"").

Accordingly, border searches of electronic devices without reasonable suspicion do not violate the

Fourth Amendment.

   2. Retention of Electronic Devices for Reasonable Period to Complete Border Search:
Plaintiffs' challenge to Defendants' policies allowing detention of electronic devices for a reasonable

period in order to complete the border search also lacks merit. Contrary to Plaintiffs' assertion (Pl.

Opp. at 26), the challenged policies do not permit indefinite detention of electronic devices without

suspicion. Rather, on their face, the policies provide that electronic devices may be detained for a

reasonable period of time to perform a border search. *See* CBP Directive, ¶ 5.3.1; ICE Directive, ¶

8.3(1). Under the policies, a CBP or ICE agent may retain the electronic device only for a set period

13

of time unless special approval is received. *Id.*[10] These provisions are fully consistent with the Fourth Amendment. Def. Mem. at 24-26. The Fourth Amendment does not set arbitrary limits on the permissible duration of a border search. *See Montoya de Hernandez*, 473 U.S. at 543.

In their opposition, Plaintiffs nevertheless attempt to impose arbitrary limitations on the length and location of a border search of an electronic device. Plaintiffs argue that a customs officer cannot conduct such a search, unless he/she conducts the search at the border crossing and returns the device immediately to the traveler. To support this contention, Plaintiffs rely on three district court decisions which erroneously concluded that searches of electronic devices detained at border crossings but forensically examined at other sites were "extended border searches" requiring reasonable suspicion. Pl. Opp. at 27 (citing *United States v. Stewart*, 715 F. Supp. 2d 750 (E.D. Mich 2010); *United States v. Hanson*, No. CR-09-00946, 2010 WL 2231796 (N.D. Cal. June 2, 2010); *United States v. Cotterman*, No. CR-07-1207, 2009 WL 465028 (D. Ariz. Feb, 24, 2009), *appeal pending* Case No. 09-10139 (9th Cir.)).[11]

These decisions are not binding on this Court and are contrary to the holding of the Second Circuit in *United States v. Gaviria*, 805 F.2d 1108 (2d Cir. 1986). *Gaviria* held that a border search

---

[10] Except as otherwise provided by the policies, if after the information has been reviewed, no probable cause exists to seize it, the challenged policies provide that any electronic copies of the information must be destroyed, and any electronic devices returned. *See* CBP Directive, ¶ 5.3.1.2; ICE Directive, ¶ 8.5(1)(e).

[11] Plaintiffs' reliance on *United States v. Place*, 462 U.S. 696 (1983), is also misplaced. The issue in that case was not the length of a border search, but of a search under the "stop and frisk" exception to the Fourth Amendment requirement for a warrant, which is predicated on the "brevity of the invasion of the individual's Fourth Amendment's interest." *Id.* at 709. The border search doctrine, on the other hand, is not predicated on the length of the search, but on "the inherent authority to protect, and a paramount interest in protecting, its territorial integrity" and the correspondingly diminished expectation of privacy held by travelers crossing the borders. *Flores-Montano*, 541 U.S. at 153.

may be conducted at any time until the subject property clear customs. *Id.* at 1112. By contrast, an extended border search occurs when "a person or some property has cleared an initial customs checkpoint and [has] entered the United States." *Id.* (quoting *United States v. Glazia*, 402 F.2d 8, 13 (2d Cir. 1968)). In other words, whether a search should be classified as a border search or an extended border search depends not on the length of time of the search or on the location of the search, but on whether the searched item has been cleared by customs. As the facts of *Gaviria* illustrate, a border search may be conducted days after the arrival at the border and at a location remote from the border crossing. In *Gaviria*, a shipment of canned fruit arrived in Miami and was inspected there by customs officers, who saw nothing suspicious about the shipment. *Id.* at 1110. The shipment was then transported to JFK Airport, its ultimate destination, by a bonded truck carrier. *Id.* Three days after it arrived at JFK, and eight days after its initial arrival onto U.S. territory, customs officers again examined the cartons and found cocaine. *Id.* The Second Circuit held that the search at JFK was a valid border search because the shipment had never cleared customs. *Id.* at 1112. Since the electronic devices in *Cotterman*, *Hanson* and *Stewart* likewise never cleared customs and remained in customs control during the searches, those searches were border searches under Second Circuit precedent, not extended border searches.

Plaintiffs attempt to distinguish *Gaviria* as limited to shipments of goods, and not applicable to items that travelers carry with them. Pl. Opp. at 28. Yet nothing in *Gaviria* supports such a narrow and restricted reading. The Second Circuit based its holding on the greater expectation of privacy associated with property once it clears customs – which applies equally to items that the traveler carries with him and to shipments of goods. *Gaviria*, 805 F.2d at 1112. Thus, *Gaviria* has been applied to a border search of a duffel bag carried by a traveler. *See United States v. Bareno-*

*Burgos*, 739 F. Supp. 772, 778-79 (E.D.N.Y. 1990) (Raggi, J.).[12]

Moreover, Plaintiffs' attempt to set arbitrary limitations on the length and location of the border search for electronic devices is unrealistic. Def. Mem. at 24-26. For technical and logistical reasons, it is not always possible to conduct a search of a computer immediately after it comes into the possession of a law enforcement officer. *United States v. Hill*, 459 F.3d 966, 974-75 (9th Cir. 2006); *D'Amico*, 734 F. Supp. 2d at 365; *Villar*, 2007 WL 1075041 at *35. It is therefore not reasonable to expect customs officers to always be able to complete a border search of an electronic device at the time and place that the traveler crosses the border. Accordingly, for both legal and practical reasons, the Court should reject Plaintiffs' contention that customs officers must have reasonable suspicion to search a computer or other electronic device unless the officers complete the search at the border crossing and return the device immediately to the traveler.

## B. The Policies Do Not Violate the First Amendment.

Plaintiffs' First Amendment claim also fails as a matter of law. Def. Mem. at 27-28. An otherwise valid border search under the Fourth Amendment does not violate the First Amendment simply because the search may include expressive materials. *See Borello*, 766 F.2d at 58 ("the opening of the cartons and the screening of the films were plainly permissible steps in a reasonable

---

[12] Three other decisions cited by Plaintiffs (Pl. Op. 27) are distinguishable, because they involved searches that took place after the searched property had cleared customs, and thus were in fact extended border searches that required reasonable suspicion. *United States v. Yang*, 286 F.3d 940 (7th Cir. 2002); *United States v. Caicedo-Guarnizo*, 723 F.2d 1420 (9th Cir. 1984); *United States v. Laich*, No.08-20089, 2010 WL 259041 (E.D. Mich. Jan. 20, 2010). Another case cited by Plaintiffs, *United States v. Rogozin*, No. 09-CR-379, 2010 WL 4628520 (Report and Recommendation) (W.D.N.Y. Nov. 16, 2010) is distinguishable, as the officers in that case retained electronic devices for a longer period than the time permitted under CBP guidelines.

border search");[13] *Church of Scientology of Cal. v. Simon*, 460 F. Supp. 56, 59 (C.D. Cal. 1978) (border search "necessarily involves the examination or review of [written materials], for the customs officers must scan or peruse and perhaps even read the material to determine whether or not they are importable"). There is no basis to apply a different rule to searches of electronic devices. As explained *supra* at 9-10, while reviewing the contents of a laptop may disclose files which reveal the traveler's reading preferences and associations, reviewing the contents of a traveler's luggage, briefcase, and purse can do the very same. Plaintiffs offer no reason why looking at such items in electronic form should chill their First Amendment rights any more than looking at a hard copy version of the same material. Indeed, both the Fourth and Ninth Circuits have squarely rejected such claims. *Ickes*, 393 F.3d at 506; *Arnold*, 533 F.3d at 1010.

The cases cited by Plaintiffs in support of their First Amendment argument are inapposite. For example, in *Tabbaa*, the issue was not whether review of expressive materials in a border search can implicate the traveler's First Amendment rights. Instead, the issue was whether the specific targeting of the plaintiffs for a more extensive border search because they had attended an Islamic conference in Canada violated their First Amendment right of association. 509 F.3d at 102. The court held that the decision to target the plaintiffs imposed a direct and substantial penalty on them *solely* because they had attended the conference and that the prospect of being singled out could reasonably deter others from associating at similar conferences. *Id.* The court, therefore, found that the "burden on plaintiffs' associational rights was sufficiently 'significant' to implicate the

---

[13] Plaintiffs attempt to limit *Borello* by suggesting that the Second Circuit "did not pass judgment" (Pl. Opp. at 34) on whether such a search required reasonable suspicion and that the officer in that case had reasonable suspicion. However, this argument ignores the fact that the court referred to the search as "routine." 766 F.2d at 58.

protections of the First Amendment." *Id.* The court nevertheless rejected plaintiffs' First Amendment challenge and upheld the searches. *Id.* at 105. Plaintiffs here cannot even show that the challenged policies implicate the First Amendment, much less violate the First Amendment. Plaintiffs assert that the mere existence of the authority to conduct searches of electronic devices in general somehow "chills" their First Amendment rights. Plaintiffs do not allege that they have been targeted for searches because of their political or religious beliefs or associations or suffer any direct or substantial penalty as a result of their exercise of their First Amendment rights. Instead, to the extent that there is any impact on their First Amendment rights, it is at most incidental. An incidental burden is not sufficient to establish a cognizable First Amendment claim. *See Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996) (distinguishing between government conduct which "incidentally inhibits" First Amendment rights from government conduct which imposes a "direct and substantial" burden).

*NAACP v. Alabama*, 357 U.S. 449 (1958), and other cases challenging requirements that an association disclose its membership list are also not on point. *See* Pl. Opp. at 31. Those cases involved purely domestic concerns, not border searches, and more importantly, involved the targeting of the members of certain organizations, resulting in a chill of the members' rights of association. In *NAACP*, for instance, Alabama brought a suit against the NAACP to enjoin it from conducting further activities. As part of this suit, Alabama sought production of the NAACP's membership list. The Supreme Court found that the NAACP had demonstrated that the demand for its membership list imposed a direct and substantial burden on their members' exercise of First Amendment rights because the uncontroverted evidence showed that "on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss

18

of employment, threat of physical coercion and other manifestations of public hostility." 357 U.S. at 462. In that case, the NAACP had not only been targeted but also had demonstrated that production of the list was demonstrably likely to chill their members' right of association. Here, nothing in the challenged policies indicates that Defendants target members of a particular group or that Plaintiffs will suffer any penalty for exercising their First Amendment freedoms.

The cases cited by Plaintiffs in which a law enforcement entity directly sought information regarding movies or books purchased from a website are also distinguishable. Pl. Opp. at 32. Here, the focus of a border search is not gathering information on a traveler's reading preferences, but "preventing the entry of unwanted persons and effects" from entering the United States. *Flores-Montano*, 541 U.S. at 152. Thus, to the extent that a search of a traveler's electronic devices may reveal any reading preferences, it is at most a purely indirect and incidental result of the search. Plaintiffs' First Amendment claims should, therefore, be rejected.

## III.   THE BORDER SEARCH OF ABIDOR'S LAPTOP WAS CONSTITUTIONAL.

Abidor's challenge to the May 2010 border search of his laptop and external hard drive should also be dismissed for failure to state a claim. Like Plaintiffs' facial challenge to the policies, this claim is predicated on the erroneous assumption that Defendants must have reasonable suspicion to search electronic devices at the border. The only additional argument presented is that the "cumulative effect" of his May 2010 border search rendered it non-routine. Pl. Opp. at 35. To support this assertion, he argues that the Second Circuit has suggested that "in some circumstances the cumulative effect of routine searches can render the entirety of the search non-routine." Pl. Opp. at 35 (citing *Tabbaa*, 509 F.3d at 99). He then concludes that if the Second Circuit found that the questioning, pat-down, photographing, and fingerprinting of the individuals in *Tabbaa* were "near

19

the outer limits of what is permissible absent reasonable suspicion," the May 2010 search must have exceeded those outer limits because CBP not only questioned, frisked, photographed and fingerprinted him, but also searched his laptop. *Id.* at 35 . In short, he argues that even if the May 2010 search of his electronic devices was an otherwise permissible routine search, it was rendered unconstitutional because he was also questioned, frisked, photographed and fingerprinted.

This argument is flawed. First, the Second Circuit in *Tabbaa* did not find that there may be instances where the cumulative effect of the search may render it non-routine. Instead, the Second Circuit simply noted that it was not reaching that issue. *Tabbaa*, 509 F. 3d at 99. Second, while the Complaint mentions that Abidor was subjected to a pat-down search, photographed and fingerprinted, he does not claim that any of these actions were unconstitutional. Instead, he claims only that "[s]earching, copying, and detaining [his] electronic devices" violated his Fourth Amendment and First Amendment rights. Compl. ¶¶ 130-31. Abidor cannot now try to use the manner in which he was searched to challenge the search of his laptop as invalid. Third, and most significantly, the searches of the plaintiffs in *Tabbaa* were alleged to have been far more intrusive than the search of Abidor. Unlike Abidor, two of the *Tabbaa* plaintiffs alleged that "CBP officers forcibly kicked their feet open and almost knocked them on the ground in order to effectuate the pat-downs." *Tabbaa*, 509 F. 3d at 95. Also unlike Abidor, three of the *Tabbaa* plaintiffs alleged that some physical force was used to take their fingerprints. *Id.* Abidor's challenge to the May 2010 search of his computer should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion to Dismiss.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

TONY WEST
Assistant Attorney General

ELLIOT M. SCHACHNER
Assistant U.S. Attorney

SANDRA M. SCHRAIBMAN
Assistant Branch Director

s/Marcia Sowles
MARCIA SOWLES
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
20 Massachusetts Ave., N.W., Room 7114
Washington, D.C. 20530
Tel.:    (202) 514-4960
Fax.:   (202) 616-8470
Email: marcia.sowles@usdoj.gov

21