UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
ABIDOR, et al.,                : 10-cv-4059-ERK
            Plaintiff,         :
                               :
    - versus -                 : U.S. Courthouse
                               : Brooklyn, New York
NAPOLITANO, et al.,            :
            Defendant          : July 8, 2011
------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE EDWARD R. KORMAN
UNITED STATES SENIOR DISTRICT JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

<u>**For the Plaintiff**</u>:          **Arthur Eisenberg, Esq.**
                              **Catherine N. Crump, Esq.**
                              **Michael Price, Esq.**
                              New York Civil Liberties
                              Union Foundation
                              125 Broad Street, 17th Floor
                              New York, NY 10004


<u>**For the Defendant**</u>:          **Elliot M. Schachner, Esq.**
                              United States Attorneys
                              Office
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, NY 11201-1820

                              **Marcia K. Sowles, Esq.**
                              **Sandra Schroibman, Esq.**
                              U.S. Department of Justice
                              Civil Division
                              20 Massachusetts Ave NW
                              Room 7114
                              Washington, DC 20530

<u>**Transcription Service**</u>:     <u>**Transcription Plus II, Inc.**</u>
                              3589 Tiana Street
                              Seaford, N.Y.  11783
                              Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

1          THE CLERK:  Abidor v. Napolitano.  Your

2    appearances, counsel.

3          MS. SOWLES:  Marcia Sowles for the defendant.

4          MS. CRUMP:  Catherine Crump for the plaintiff.

5          MR. SCHACHNER:  Elliot Schachner, also for the

6    defendant.

7          MS. SCHROIBMAN:  Sandra Schroibman, Department

8    of Justice, also for the defendant.

9          MR. PRICE:  Michael Price for the National

10   Association.

11         MR. SIRACUSA HILLMAN:  Benjamin Siracusa

12   Hillman (inaudible).

13         THE COURT:  I can't hear you.

14         MR. SIRACUSA HILLMAN:  Benjamin Siracusa

15   Hillman (inaudible).

16         UNIDENTIFIED SPEAKER:  (Inaudible).

17         THE COURT:  Okay.  It's your motion.

18         MS. SOWLES:  Okay.

19         THE COURT:  I think it is.

20         MS. SOWLES:  Right, Yes, your Honor.  The

21   Supreme Court has held that border searches of a person

22   and their baggage are subject to search without any

23   reasonable suspicion.  This has been a long established

24   rule and pursuant to that procedure, the border -- the

25   United States Customs and Border Protection and ICE has

1  issued policies which basically apply that policy to

2  electronic searches.

3          The plaintiffs in this case are challenging it,

4  alleging that this policy violates the Fourth and First

5  Amendment.  The defendants in this case believe that it

6  should be dismissed for primarily two reasons.  First,

7  with respect to their facial challenge to the policy, it

8  should be dismissed because the plaintiffs have not shown

9  standing to bring such a facial challenge and seeking

10  prospective relief.

11          And second, if you look at the merits, it

12  should also be dismissed because pursuant to the long

13  established rule that --

14          THE COURT:  Okay.  I mean there is standing to

15  challenge it as applied, at least to the person who

16  computer was searched.

17          MS. SOWLES:  Searched.  That is correct,

18  your Honor, with regard to him.  And with regard to that,

19  there's -- in any case, there's no merit to their claim

20  that it violates the Fourth Amendment because there is

21  this long-established rules and courts have repeatedly

22  found that with regard to computer searches, that there's

23  no reason to treat them any differently.  And the same

24  with regard too their First Amendment, that both the

25  Fourth and the Ninth Circuit rejected those Fourth

Proceedings

1  Amendment -- the First Amendment claims.

2        Turning first to standing and the facial

3  challenge, as the courts have recognized that past

4  exposure to alleged harm or alleged unconstitutional

5  behavior is not sufficient to allow for prospective

6  injunction.  And that instead, you have to show some

7  immediate danger that you're going to be repeatedly

8  subjected to this, that challenged behavior.

9        And in this case, the plaintiffs cannot simply

10  show this, that while there is a policy that there's --

11  that if you look at their own statistics that they cite

12  in their complaint, there's only one in 90,000 for every

13  past traveler that -- who has their laptop searched and

14  that statistics, even if you look at the actual

15  plaintiffs in this case, that Mr. Abidor, even though he

16  says that he's a regular repeat traveler and frequently

17  travels abroad, he has only had one instance where his

18  laptop was actually searched.  And with regard to the

19  organizational plaintiffs, even though that they have --

20  you know, they say that they have several thousand

21  members, again they only point to one member who was

22  searched in 2007 and another member in 2008.

23        And so that they do not show this immediate

24  threat that's required for any challenge to the facial

25  challenge, and therefore with regard to the facial

1 challenge, it should be dismissed for that basis.

2          But even if this court were to reach the

3 merits, there's simply no basis for either the Fourth or

4 First Amendment challenge.  With regard to again, a

5 facial challenge to the policy, the plaintiffs have a

6 very heavy burden.  They have to, with regard to a facial

7 challenge, you would have to show not just that it may be

8 unconstitutional applies to certain instances but that

9 every application of the policy would be unconstitutional

10 and they just simply can't show that in this case.

11          That the Courts have repeatedly recognized that

12 the border searches are reasonable by the very nature and

13 that's nature and that's because it's -- you're

14 protecting the borders so that historically the sovereign

15 has the authority to protect the borders and therefore,

16 individuals and their belongings can be searched without

17 any reasonable suspicion and that has been upheld.

18          And that the Courts have recognized that

19 there's no difference with regard to computers and there

20 shouldn't be any difference.  The plaintiffs in this case

21 try to suggest that there should be differences because

22 that they may contain personal information, they may even

23 contain expressive material but again, if you look at the

24 -- at each of these, that same could be true of the hard

25 copies, that hard copies that -- or other items that are

1 in your possession in two cases can also be very personal

2 in nature.  It can be a prescription.  It could be

3 pictures of the family.  It can be, you know, a very

4 private thing; diaries.

5          And that just because it's on a computer, it

6 shouldn't be any more protected; in other words, under

7 their theory, that you could have the very same piece of

8 paper, the very same thing, that's on their computer, and

9 it could be searched if it's in a hard copy and in their

10 suitcases.  So there's no reason that it should be

11 protected simply because it's on the computer.

12          The same with regard to expressive materials.

13 Again, the courts have repeatedly found that borders --

14 with regard to border searches, there's no special

15 exception for expressive materials.  Indeed, if you look

16 at the authority for the CBP and ICE, their authority

17 includes -- you know, it's like child pornography and

18 things that are very, by their very nature, are

19 expressive in nature or films and things like that.

20          Furthermore, they didn't try to distinguish it

21 on the fact that there's a size.  And they say well, size

22 should matter in this case and because computers can have

23 several thousand documents.  But again, the size

24 shouldn't matter.  I mean that would be a really perverse

25 standard, sort of suggesting that the more you bring

Proceedings

1  across the border, the less the government has a right to

2  search it.  And again, there's no requirement for that.

3  It just doesn't make sense.

4          They furthermore say well, there's a need, that

5  somehow computers are becoming more and more, just an

6  every day device and therefore it's something that you

7  need and therefore, you can't be without it.  But again,

8  that could be said of any number of things that --

9          THE COURT:  Assuming it's true.

10          MS. SOWLES:  What?

11          THE COURT:  Assuming it's true.

12          MS. SOWLES:  True. Right.  And that that, in

13  fact, as you point out, I mean there's things that you

14  can leave at home.  In fact, you know, a lot of

15  corporations have suggested that because of the problems

16  of theft and interception and by, you know -- over the

17  internet and just security in other countries that,

18  sometimes it's best to take less than to take more on the

19  computer.  And maybe leave it at home if at all possible.

20          But with regard to -- and that again, so

21  there's no matter how you slice it, there's really no

22  difference and that to suggest as the plaintiffs are

23  suggesting that you should carve out this exception,

24  would really just be creating a gigantic loophole because

25  to the extent that they're saying they're more and more

1  common, then for that very reason, you shouldn't be

2  creating this loophole because, you know, again the very

3  same, you know, document that you could find if you were

4  in a suitcase, we shouldn't allow them to hide it by

5  having it in a computer.

6          And again, the -- under the policy that does

7  allow for detention and time to search but again, they

8  try to say that that somehow makes it unconstitutional.

9  But again, there are, if you actually look at the

10  guidelines, the guidelines are actually protective.  I

11  mean they add more things than probably the Fourth

12  Amendment even requires by having time limits and that if

13  you see those time limits, then you would have to have

14  supervisory checks.  And that they also may safeguard and

15  the computer by saying that, you know, it's going to --

16  if it's kept that it's, you know, kept in a secure area.

17  Not everybody can look at it.

18          So -- and even just the fact that they've

19  issued the guidelines themselves and make the directive

20  public, that that's a safeguard because it's alerting

21  people that they are going to be subject to a search,

22  that it's not something that is coming as a surprise.

23          That, you know, and the government has been --

24  you know, is cognizant of, you know, privacy concerns and

25  they have tried to protect those privacy concerns but at

1  the same time the government has also recognized that

2  just as with regard to anything else that you bring

3  across the border, there are important security, you

4  know, concerns with regard to terrorists.  There's also

5  just they have enforcement activities.

6         And again, you shouldn't create a rule in which

7  you can allow a child pornography picture to see it and

8  seize it if it's in hard copy but it can be protected if

9  it's on the computer.

10        Again, with regard to the First Amendment,

11 agin, both this is an issue that has been considered by

12 the Fourth Circuit and the Ninth Circuit and they have

13 rejected the fact that it doesn't violate the First

14 Amendment, that this is not a case where they try to

15 compare it with Tababb (ph.) but in that case, the

16 individuals there was a personal search, not a search of

17 their property that they were complaining about.  And

18 they were also targeted because they had, in fact,

19 attended a Muslim conference in Canada.  And they were

20 specifically targeted for that -- their First Amendment

21 activity.

22        In this case, there's no suggestion that the

23 directives, you know, targeted any particular person.

24 That, in fact, you know, just the opposite; that there

25 doesn't require a reasonable suspicion.  And to the

Proceedings

1  extent that they may incidentally by looking at their
2  computer, be aware of maybe or reading interest or things
3  like preferences, that that's again the same thing could
4  be said in looking through your suitcase.
5          So no matter how you slice it, either as a
6  First Amendment challenge or a Fourth Amendment
7  challenge, that basically they're asking to carve out the
8  special exception for computers and that there's really
9  no logical basis in law for it because -- and it would be
10  creating an actual, you know, danger to enforcement
11  activities because it's something that it would be
12  creating basically a loophole.
13          MS. CRUMP:  In this case, the border agents
14  took Mr. Abidor's laptop and they looked at his personal
15  photographs, his correspondence with his girlfriends, his
16  e-mail exchanges, his tax returns, his class notes.  The
17  policies that plaintiffs challenge purport to authorize
18  the government to go through electronic devices and look
19  at this personal and sensitive material for any reason or
20  no reason at all.
21          In plaintiff's view, the Fourth and the First
22  Amendments require the government to have at least
23  reasonable suspicion before they can search electronic
24  devices.
25          Searches of electronic devices implicate

Proceedings

1 significant privacy interests.  Electronic devices often

2 contain vast quantities of information.

3          THE COURT:  Well they do but if we were here

4 ten or fifteen years ago, we wouldn't be having this

5 conversation.  Somehow we all managed to live without

6 carrying all of this stuff around.

7          MS. CRUMP:  That's true.  But the world has

8 changed.  People now travel with their laptops.  The

9 legal profession has changed.  The National Association

10 of Criminal Defense Lawyers --

11          THE COURT:  They've changed?

12          MS. CRUMP:  -- have members who frequently

13 travel overseas.  And they need to have their laptops

14 with them in order to be able to conduct their practices.

15 It's simply not the same world it was before.  The

16 reality is that we cross the border with these devices.

17 And the question is how to apply the Fourth and the First

18 Amendment in the face of this new reality.

19          And plaintiff's view is that because of not

20 just the volume of information that can be on these

21 devices, but also the frequently sensitive nature of

22 them, that a higher standard should apply.

23          THE COURT:  Well all of that could

24 theoretically be true of materials that are not carried

25 in a computer, that are carried in a suitcase or a

Proceedings

1  briefcase.

2          MS. CRUMP:  Yes, and the plaintiffs believe

3  that Judge Kozinski was correct in his dissent in Seljan

4  that all expressive material should be subject to

5  reasonable suspicion requirement.  This court doesn't

6  need to go that far in this particular case because

7  plaintiffs are specifically challenging an electronic

8  device search policy.

9          I think the documents that Mr. Abidor's

10  computer had on them search illustrate how sensitive the

11  materials on laptops can be but those sensitivities,

12  they're also magnified for lawyers who travel

13  internationally with their clients' materials on their

14  laptops.  And also journalists, particularly journalists

15  covering events overseas who may have sensitive source

16  information on their laptop such as members of the

17  National Press Photographs Association.

18          The policies that plaintiffs challenge are --

19          THE COURT:  And what do they do -- how did they

20  travel before computers became so widespread?

21          MS. CRUMP:  Well --

22          THE COURT:  I mean what did they do?

23  Presumably whatever information was really essentially

24  had to be carried, I think there's a lot of -- materials

25  on the computer that do not need to be there and are

1  there for convenience, and that changed the scope of your

2  argument but in terms of all of the materials on a

3  computer, people keep things there for convenience and

4  not necessarily need.  But what did a lawyer do fifteen

5  years ago when he had a client who presumably made notes?

6  I mean I don't carry a laptop computer with me but I

7  never leave the court -- I never take a court document, I

8  never take anything from the file.  Even when I take a

9  draft of an opinion, I tear off the first page and the

10  last so God forbid I should lose it, nobody should be

11  able to -- look, they should have trouble figuring out at

12  least what it relates to because there's always a risk

13  that -- of material falling into the wrong hands.  So

14  what did people do before computers?

15           MS. CRUMP:  Well, I think many of the --

16           THE COURT:  What did lawyers do?  What did

17  press photographers do?  I mean people kept information

18  in books.  And what we're talking about here in terms of

19  sheer numbers is almost nothing.

20           MS. CRUMP:  I think many of the same

21  concerns --

22           THE COURT:  You want 90,000 and then I don't

23  know how much it comes out to a year in terms of the

24  number of people that are actually -- this policy

25  actually impacts.  I think I saw an article in the Times.

Proceedings

1 I forget. It wasn't a year or maybe nine months, where

2 there were 6,000 searches like this and about 3,000 were

3 of American citizens. So we're talking -- we're not

4 talking about the government standing at the airport

5 going through everybody's computer.

6        MS. CRUMP: I don't think the fact that only a

7 small number of people has been affected relatively --

8 you know, 6,000, you know, it's not that small and if you

9 violate one person's constitutional rights, it's still a

10 constitutional violation.

11        THE COURT: Well, the constitutional test is

12 what's reasonable. There's no -- the words reasonable

13 suspicion don't appear in the constitution. Probable

14 cause appears in relation to what a warrant is supposed

15 to be issued on the basis of. It does not necessarily

16 apply to all searches. Border searches have always been

17 -- at least I've always looked upon them as coming in

18 within what's called the administrative search exception,

19 where the administrative searches in which the goal of

20 the government is not to search for evidence to prosecute

21 people for crimes, even though they might come across

22 such evidence but where the principle goal is

23 administrative. Custom searches is one. And searches

24 that are designed to protect and prevent attacks on

25 national security would be another.

Proceedings

1          And if they found something and if they used

2    it, okay, but these were not the principle purposes of

3    the search.  And so you have a whole -- it always struck

4    me that the Customs searches fell within those kinds of

5    administrative searches which in depending upon the

6    cases, have done away with warrant -- traditional warrant

7    requirement, probable cause, and even sometimes

8    reasonable suspicion.

9          MS. CRUMP:  Well it's certainly true that in

10   many cases, reasonable suspicion isn't required for a

11   border search.

12         THE COURT:  And for other kinds of searches.  I

13   mean, all I am suggesting is that if I had to put a label

14   on this, it would be like an administrative search, like

15   if you were approaching the Verrazano Bridge as I once

16   was as a passenger in a car, the police were conducting

17   -- they were asking -- they were stopping every car to

18   determine whether the driver was driving while

19   intoxicated.  They had no reasonable suspicion.  And

20   certainly no probable cause.  And that kind of a search,

21   that kind of a stop and inquiry is valid without any kind

22   of evidentiary showing.

23         MS. CRUMP:  In the border search context, the

24   Supreme Court has distinguished between routine and non-

25   routine searches.

Proceedings

1   THE COURT:  Yeah, well it's one thing to talk

2   about a body search, a body cavity search and another

3   thing to talk about other kind of searches that don't

4   involve that kind of violation of bodily privacy.

5   MS. CRUMP:  The Supreme Court has never limited

6   its routine versus non-routine searches to bodily

7   searches.

8   THE COURT:  Well, they never extended it --

9   MS. CRUMP:  And it --

10  THE COURT:  -- as far as I know.  I mean again,

11  we're talking about a test of -- you know, a question of

12  what's reasonable.

13  MS. CRUMP:  That's right.  And in plaintiff's

14  view, laptops searches because of the vast quantities of

15  expressive materials that laptops contain are akin --

16  THE COURT:  Well, he -- in terms of -- it's

17  known that these kinds of searches could be conducted,

18  even though they're conducted on an extraordinarily

19  infrequent basis.  And there's no necessity to carry

20  around all of this information on a computer, just

21  because it happens to be convenient.  Again, I would take

22  precautions.  I don't travel with a laptop only because I

23  live in the -- I'm from an older generation that didn't

24  become addicted to it but when I carry papers, I never

25  travel with what I regard to be confidential papers.  Not

1  because I'm afraid the government is going to search, but

2  I'm afraid I'll lose it.  So that I make a decision that

3  I am not taking this stuff with me.  I'll e-mail it to

4  myself.

5          MS. CRUMP:  Well, and I think that points out

6  one of the flaws of this policy.

7          THE COURT:  What is that?

8          MS. CRUMP:  It's so easy to evade in some

9  circumstances through things like e-mail.

10          THE COURT:  Well, it may be.

11          MS. CRUMP:  Which raises a real question about

12  how effective the policy actually is.  But in any event,

13  not everyone has the choice to leave behind confidential

14  information when they travel abroad.  For example,

15  criminal defense attorneys conducting mitigation research

16  overseas need to be able to conduct interviews and to

17  bring their notes back across the border free from

18  government scrutiny.  The government --

19          THE COURT:  Well, I would assume that before

20  there were computers, they kept their notes somewhere

21  else.  The notes were, you know, they might have been

22  kept in a notebook.  I don't quite understand.  I assume

23  that the notebook was still subject to being examined.  I

24  mean I am not even sure that they're permitted to read

25  every document.  Are they permitted to read every

Proceedings

1   document under your policy or are they --

2          MS. SOWLES:  Well again, you know, they're

3   required to search and then in some cases that does

4   require you to read it --

5          THE COURT:  Some cases --

6          MS. SOWLES:  -- to understand what it is.  And

7   that, you know, it --

8          MS. CRUMP:  Plaintiff's view is that that also

9   requires reasonable suspicion.  There's serious First

10  Amendment concerns with this policy.  Individuals have

11  always had the right to exercise their First Amendment

12  rights free from government scrutiny.  The Supreme Court

13  has recognized that in the domestic context and its

14  association jurisprudence in cases such as NAACP v.

15  Alabama where the court held that Alabama could not force

16  the NAACP to disclose its membership lists without a

17  compelling reason because that would chill First

18  Amendment activity.

19          Lower courts have not had any difficulty

20  applying that principle in the context of the privacy of

21  reading records.  So, for instance, when the government

22  has attempted to subpoena reading records from an online

23  bookseller such as Amazon, the courts have held that that

24  intrusion into reading privacy implicates the First

25  Amendment and have struck down those subpoenas as not

1  meeting heightened scrutiny.

2          The First Amendment does apply in the border.

3  I think the Debaugh (ph.) case is one example of that but

4  so is the Supreme Court's decision in Lamont v.

5  Postmaster General where the Court considered a

6  regulation that required anyone wanting to receive what

7  the government dubbed communist propaganda to notify the

8  government in writing that it wanted to receive that kind

9  of international mail.  And the Court held that that

10  violated the principles of free speech.

11          I think these -- it's clear that the border

12  search policy allowing the government to go through

13  individual's expressive materials at the border without

14  any reasonable suspicion also exercises a severe chill on

15  speech and couldn't pass any form of heightened scrutiny.

16          THE COURT:  That would apply to any -- it would

17  go beyond computers, your argument.

18          MS. CRUMP:  It would go beyond computers, your

19  Honor.

20          THE COURT:  For any book.

21          MS. CRUMP:  That's true.

22          THE COURT:  So we're not -- there's nothing

23  special here about your argument as it relates to

24  computers.

25          MS. CRUMP:  I tink the context that the

Proceedings

1 computers heightens the concern because of the quantity

2 and quality of documents there but the argument applies

3 regardless whether it's in paper or in electronic format.

4          But, you know, in this case, plaintiff Abidor

5 no longer feels like he can download and carry across the

6 border certain types of information for fear that that

7 will be misconstrued by the government.  He now self-

8 censors what he reads on his computer.

9          And NACDL members likewise refrain from taking

10 notes during certain meetings because they are fearful

11 that the government will then intrude into their privacy

12 by reading those notes.

13          And these First Amendment concerns are serious

14 and a reasonable suspicion requirement would be the best

15 way to honor the First Amendment at the border.

16          THE COURT:  And that would provide comfort to

17 the defense lawyers?  I mean you've got to be kidding.

18          MS. CRUMP:   Well, yes.

19          THE COURT:  I mean you've got to be kidding

20 that that would provide -- that would take away their

21 whole concern if there was simply reasonable suspicion.

22          MS. CRUMP:  I think there's a meaningful

23 difference between having no standard at all to govern

24 the thousands of agents who are present at our border and

25 having a reasonable suspicion requirement because that

1   would at least require them to be able to articulate some

2   reason why people are being selected.

3           THE COURT:  That may be but if -- I don't know

4   how much comfort it would give anybody.  It's the fact

5   that under some extraordinarily minimal standard, a

6   defense lawyer could have his note searched or presumably

7   looked through.  I mean the reality is is that I doubt

8   whether a reasonable suspicion standard would give

9   anybody comfort.  In fact, I don't even think a probable

10  cause one would.  But the reality is is that you're

11  concerned about presumably the government being able to

12  look at these papers under any circumstances.  You just

13  want to put a -- you know, a little speed bump is not --

14  I can't believe a little speed bump is going to give any

15  defense lawyer comfort.

16          MS. CRUMP:  Well, I mean if that's the case,

17  then the (indiscernible) carry a search requirement and

18  all of these requirements are meaningless.  But I think

19  one of the things that the plaintiffs are concerned about

20  is arbitrary action by the government officials.  There's

21  a lot of CBP officers out there.  And a requirement that

22  they have some reason to believe that a search will turn

23  up evidence of a violation of law by CBP rights would

24  provide some comfort.  That's --

25          THE COURT:  Well, there are other ways to deal

1   with -- I mean in the case that I told you about, the

2   Supreme Court, for example, in automobile stop cases

3   where the Court said that in these random stops that I

4   told you about, that the Supreme Court said well, you

5   know, you're all concerned that they're going to stop you

6   because race or sex.  So, as long as they had some

7   neutral standard, they could stop without reasonable

8   suspicion.  You want the letter A or want the -- I mean,

9   number one, or an odd-numbered license plate and an even

10  numbered license plate, that's not going to solve your

11  problem, the National Defense Lawyers, however.

12        MS. CRUMP:  Well the National Defense Lawyers

13  think it will solve their problem, so --

14        THE COURT:  I mean, I don't know, is it the

15  National Defense's -- National Association of Defense

16  Lawyers.

17        MS. CRUMP:  The current electronic search

18  policies are extremely broad.  It's not just the

19  government asserts that it has the right to search

20  someone's laptop while they're at the border.  And by the

21  way, the government asserts it has that right regardless

22  of the type of information being searched, whether it's

23  attorney client privileged information or a confidential

24  source for a reporter that, you know, the policies have

25  some language in them acknowledging that these materials

1  are sensitive but nothing in the policy requires

2  reasonable suspicion, even for those types of materials.

3          The policies empower the government not just to

4  search while someone is at the border but also to take

5  their laptop from them when they cross the border and to

6  continue searching that laptop or other electronic device

7  for as long as the government wants.  You know, the

8  policy does provide as defense counsel pointed out where

9  there are supervisory approvals, but it doesn't provide

10 for any ultimate time line in how long a laptop can be

11 taken.

12         THE COURT:  Well it would presumably -- it

13 couldn't be kept indefinitely.

14         MS. CRUMP:  There's nothing in the policy that

15 says that.

16         THE COURT:  Well --

17         MS. CRUMP:  And the practice --

18         THE COURT:  And first of all, as I understand

19 it, they can only seize and retain it if they have

20 probable cause.

21         MS. CRUMP:  I don't think that's an accurate

22 reading of the policy.

23         THE COURT:  I'm looking at the CPB directive

24 section 5.4.1.1 --

25         MS. CRUMP:  I --

Proceedings

1          THE COURT:  -- which deals with when officers

2    may seize and retain.  It says --

3          MS. CRUMP:  I think the -- I'm sorry,

4    your Honor.

5          THE COURT:  Go ahead.

6          MS. CRUMP:  I think there's a significant carve

7    out --

8          THE COURT:  It is 5.4.1.1.

9          MS. CRUMP:  5.4.1.1.  Yes.  Okay.  So that's

10   what that section says.  But then there are other carve

11   outs in later portions of the policy.  I'm looking for

12   the exact section.  They're set in our brief if you'll

13   bear with me, I'll pull up those citations.

14          (Pause.)

15          MS. CRUMP:  My co-counsel has just pointed out

16   to me that if you continue on to read Section 5.4.1.2 the

17   policies address the circumstances under which the

18   government can obtain information without probable cause.

19   And that includes when the information relates to

20   immigration, customs and other law enforcement matters

21   which is a fairly broad exception.

22          And then once information is retained, the

23   policy explicitly provides that the information can be

24   shared with federal, state, local and foreign law

25   enforcement agencies.

1        THE COURT:  What information is that again?

2        MS. CRUMP:  Information that's retained for

3  immigration and customs and other law enforcement

4  matters.  So the policy provides the government with

5  sweeping authority to search people's laptops for as long

6  as they deem appropriate and then to keep information

7  from them and to share that information with other

8  agencies, at least where it pertains to the law

9  enforcement or an immigration matter.

10       THE COURT:  For what --

11       MS. CRUMP:  And these -- this imposes a

12  significant burden on people's exercise of their First

13  and Fourth Amendment rights because people won't be able

14  to travel with this information without fear that the

15  government will not just --

16       THE COURT:  I mean normally you would travel --

17  you want to bring stuff into the country, you're going to

18  have customs information and there's also going to be

19  traveling immigration documents.

20       MS. CRUMP:  Well, yes, people do travel with

21  information.  But this -- I sense that you -- and this

22  information is often quite sensitive and there's a lot of

23  it and that's what people travel with these days.  And

24  it's often necessary for them to travel with that

25  information and it imposes a burden on people's exercise

Proceedings

1  of their rights.

2          I think for that reason, these searches under

3  the Fourth Amendment should be classified as --

4          THE COURT:  Well there are lots of burdens that

5  unfortunately people are subject to when they travel.  I

6  mean it's an unfortunate part of the post-9/11

7  circumstance that exists.  I don't particularly enjoy

8  traveling on airplanes.  I mean it's a burden to me to go

9  through the security search.  They don't recognize my

10  credentials from the administrative office from the

11  United States Courts.  And I have to travel -- even when

12  I travel in the United States, I carry a passport.  They

13  should recognize it.  They just don't.

14          I mean there are lots of burdens that people

15  are subject to in order to protect their own security and

16  the security of other people.

17          MS. CRUMP:  That's true but the burdens still

18  have to be reasonable and there's no evidence that --

19          THE COURT:  I know.

20          MS. CRUMP:  -- that this suspicion-less search

21  policy actually helps advance the government's law

22  enforcement interests.

23          THE COURT:  One of the aspects of the

24  administrative search cases that I have eluded to is that

25  aside from the fact that the principle purpose of these

1    searches is not to find evidence of crime, is that if you

2    imposed the same standards that you do on -- not only

3    normal searches to look for evidence of crime, then it

4    would often be impossible to carry out these kinds of

5    administrative searches.

6           In other words, if the government inspector

7    wanted to enter my building to inspect the electricity

8    just to see whether my building is complying with the

9    law, if there were a requirement of reasonable suspicion

10   or of probable cause, he might not be able to take action

11   to enforce the building code.

12          So I mean basically the what you have in the

13   administrative search context is part of the protection

14   at least as it reviewed by the Court is that when they're

15   not -- when police are not searching for evidence, when

16   officers of the government are not searching for evidence

17   they might be much more restrained in what they do.  You

18   could compare for example, the number of frisks -- stop

19   and frisks in Brooklyn with the number of searches of

20   computers in Kennedy Airport.  And you'll see the

21   difference.

22          And the other half of it is that it's also

23   impossible to conduct such searches if you're going to

24   set up evidentiary (indiscernible) that have to be met

25   because it also can't be met.  And that's why I can -- I

1  have a choice when I go to the airport of submitting

2  myself to a search which has become arguably more

3  intrusive with this fancy little equipment, or I can not

4  fly.

5           So I've put to this (indiscernible) choice.

6  And the government's position is in this administrative

7  search context.  And this is that they knew we couldn't

8  properly provide the security that's necessary if they

9  had, let's say -- have reasonable suspicion or probable

10 cause.

11          MS. CRUMP:  I don't think the analogy to the

12 administrative search doctrine works because the

13 government is also enforcing criminal laws at the border

14 and --

15          THE COURT:  Well, they always have but in the

16 administrative search context, the question focuses on

17 what's defined by the purpose of the search.  It's

18 entirely possible that you might also find evidence of

19 crime, and that's not the purpose of the search.  It's

20 not to find evidence of crime.  If you do, you do.  It's

21 sort of like if you search somebody's suitcase and you

22 find narcotics, well they're going to be subject to

23 prosecution; bring drugs into the country, but the

24 purpose of the search is prevent drugs from coming into

25 the country.  In fact, you may find evidence does not

Proceedings

1  move that out of the category of administrative searches.

2       This is part of my own theory. I mean if you

3  look under administrative searches, you might not find

4  depending on the book, as to searches, searches of the

5  border but that's how I -- that's how it fits into my

6  understanding of how the Fourth Amendment operates.

7       MS. CRUMP:  In the plaintiff's perspective,

8  these searches are quite intrusive and different because

9  of he nature of the expressive materials involved.

10       THE COURT:  Well how do you answer the argument

11  that I've just made?  I make a choice when I fly.  The

12  choice is, I fly.  I take a bus or I take a train.   And

13  if I choose to fly, I have to go through this intrusive,

14  annoying, time consuming procedure.  You don't have to

15  carry all of this stuff on the laptop.  You could have a

16  special -- a laptop when you travel that carries

17  materials that don't contain the picture of your whole

18  life.

19       MS. CRUMP:  Even if the domestic travel context

20  though, there are limits on what the government can do

21  into reasonable --

22       THE COURT:  Well now I'm talking about

23  domestic.  There is a difference between domestic travel

24  and travel across international borders and the powers

25  that the government has had, going back to the earliest

 1  days of (indiscernible).

 2          MS. CRUMP:  The --

 3          THE COURT:  In fact, the border searches was

 4  recognized and codified by the same congress that enacted

 5  the Fourth Amendment.

 6          MS. CRUMP:  To be sure, the government has

 7  always had the right to conduct border searches.

 8          THE COURT:  Right.

 9          MS. CRUMP:  But those border searches have

10  always been limited by the requirements of reasonableness

11  and there have always been certain searches that have

12  been considered non-routine.  That the elementary canal

13  search is one example.

14          THE COURT:  Right.  Right.

15          MS. CRUMP:  And in plaintiff's view, this is

16  another because people have very sensitive information

17  that they now travel with.

18          THE COURT:  That they've chosen to travel with.

19          MS. CRUMP:  The --

20          THE COURT:  They've chosen to travel with; that

21  fifteen years ago, they might not have traveled with.

22          MS. CRUMP:  It's true that people have chosen

23  to travel with this information but often that's required

24  by the necessity of their jobs.  For instance, we've

25  talked about the situation with --

Proceedings

1    THE COURT:  I know but you've -- it's true that

2  a lawyer may have certain notes that he put on a computer

3  or that he may have written down on a yellow pad, but

4  what I am saying is you are -- you know, part of your

5  argument about all of this -- the reason why it's so

6  unreasonable is people have all sorts of -- they have

7  their whole life on the computer, is it's a question of

8  their own choice to travel that way.

9    MS. CRUMP:  But I think even if people have

10  limited information, they're still a First Amendment --

11    THE COURT:  I mean I wouldn't do it.  I

12  wouldn't travel that way.  I would be afraid, what if I

13  lost the computer?  What if somebody could, you know,

14  (indiscernible).  You know, people have (indiscernible)

15  codes of hacking into computers.  I mean it's risky

16  business traveling with truly confidential materials,

17  regardless of how you travel.

18    Did you retain any of this person's --

19    MS. SOWLES:  Mr. Abidor's?

20    THE COURT:  Yes.  Did you retain the  --

21    MS. SOWLES:  They're -- a copy was made and to

22  the extent that the defendants are still retaining it,

23  it's been retained because the suit has been filed, so

24  that it's being retained for litigation purposes.

25    THE COURT:  By you?

Proceedings

1          MS. SOWLES:  Right.

2          THE COURT:  But if not for that, you would give

3     it -- you would have destroyed it?

4          MS. SOWLES:  Otherwise, that would have been

5     destroyed but for the fact that cases had been filed.

6     But it's being retained pursuant to your rule 26 of your

7     things that are related to the case and since that's

8     potentially, you know, you could be considered relevant,

9     it's being retained for that purpose.

10         THE COURT:  All right.  Do you have anything

11    further?

12         MS. CRUMP:  No, your Honor.

13         MS. SOWLES:  No, your Honor, again, just as,

14    you know, the computers can be convenient but at the same

15    time just because you can carry something on it, doesn't

16    mean you have to.  And to the extent that there's issues

17    with regard to, you know, attorneys notes or whatever,

18    those are -- the fact that you would be carrying them on

19    a hard copy and carrying them, is -- shouldn't make any

20    difference.

21         THE COURT:  Are there any restrictions on what

22    can be read?  I mean --

23         MS. SOWLES:  To the extent that there's -- if

24    the -- in doing a search, if they come across something

25    that they believe is attorney/client or could be for some

Proceedings

1  other reason, protected material, they are -- they

2  contact the -- someone in the general counsel's office

3  with regard to proper advice on that.

4          THE COURT:  And where is that?

5          MS. SOWLES:  That's -- it's in 5.2 of the CPT

6  (ph.) that if officer suspects that the contents that the

7  journal's made constitute evidence of a crime or

8  otherwise pertain to a determination and (indiscernible)

9  not seek advice, this is legal matters, that says -- it

10 says that the legal matters are not exempt from a border

11 search but they are subject to special handling.  If an

12 officer suspects that the content of such materials may

13 constitute an evidence of the kind or otherwise retained

14 for determination within the jurisdiction of CBP, the

15 officer must seek advice from the CBP's associate or

16 assistant chief counsel before conducting the search and

17 the consultation of -- CBP counsel will also coordinate

18 with the United States Attorney's Office, if appropriate.

19         THE COURT:  Does suspect mean reasonable

20 suspicion?

21         MS. SOWLES:  Well it says if they suspect that

22 there's a content -- may constitute evidence of a crime,

23 so it does suggest that in those cases that there's --

24 you know, they're looking at it more closely and that in

25 those cases, they should be -- that they want to make

1  sure that they're protecting and doing what's

2  appropriate.

3       THE COURT:  Well, suppose we were here and the

4  computer had been taken, what would they actually be

5  doing?

6       MS. SOWLES:  Well again, you know, it depends

7  on the circumstances but that what the officers usually,

8  because they're -- first of all, the agencies don't want

9  to -- if they're conducting a search of a computer, they

10 don't want to sort of damage the files or you can

11 inadvertently delete the files, so that they usually as

12 the recent Cotterman decision recognized, that sometimes

13 they take it to -- they believe that they're -- if

14 appropriate, they may take it to a -- you know, people

15 that are specialists in looking at it and that part of

16 that, you know, specialization is again because they

17 don't want to -- there's a danger that they could

18 inadvertently, you know, change the file or delete it by

19 looking at it, they do make image copies of that and that

20 -- and then they review it.

21       You know, again, just as you review a suitcase

22 or in looking through it on various things or you're

23 looking through hard copies, again that's -- you know,

24 that same sort of level of standing, reading it, or you

25 know to the extent it's considered (indiscernible) that

Proceedings

1  you have to look at it to determine what it is, that

2  would be the same whether it's a hard copy or a computer

3  copy.

4          THE COURT:  Have you won any of these cases?

5          MS. CRUMP:  This is our first one, your Honor.

6          THE COURT:  What do you mean it's your first --

7  oh, it's your first one.

8          MS. CRUMP:  It's the -- maybe I misunderstood

9  your question.  I thought you were asking whether the

10  ACLU had been previously involved in any of these cases.

11          THE COURT:  No, no, no.  I mean has your view

12  prevailed in any of these case?

13          MS. CRUMP:  To some extent yes, and to some

14  extent no.  To be sure, the weight of the authority is

15  against us.  Some district courts addressing the specific

16  question of whether or not the government can keep

17  someone's laptop for a prolonged period of time to

18  continue to search it have concluded that the government

19  must have reasonable suspicion in that case.  And those

20  cases are cited in our briefs.  And one of them was the

21  Cotterman decision which has now been reversed before the

22  Ninth Circuit, although there's (indiscernible) petition

23  that will be pending in that case.

24          But it's true, we're asking your Honor to do

25  something that other courts haven't done and to hold that

Proceedings

1   there's a reasonable suspicion requirement for searches

2   of electronic devices at the border.  I think there is

3   room in the Second Circuit and Supreme Court case law to

4   reach that conclusion.

5          In the Irving case, in the Second Circuit, the

6   Court did not reach the question of whether or not

7   reasonable suspicion was required in that case.  It found

8   that reasonable suspicion was present in any event,

9   signifying that the Court obviously thought that whether

10  the reasonable suspicion requirement was necessary was a

11  hard question.

12         The Supreme Court in its Ramsey (ph.) decision

13  was dealing with whether -- was dealing with the search

14  of international first class letter mail.  In that case,

15  the court specifically noted that it didn't need to reach

16  the question of whether reasonable suspicion was

17  necessary to look through the content of mail and because

18  there was a reasonable suspicion requirement in place for

19  that postal regulation, and instead it had a footnote

20  explaining that whether or not the full panoply of Fourth

21  Amendment rights would need to apply because of the

22  sensitivity of the First Amendment material at stake was

23  not a question it needed to reach.

24         So your Honor certainly has a clear path if you

25  decide that you want to rule in plaintiff's favor and

Proceedings

1  because of the gravity of the First and Fourth Amendment

2  interests at stake, a reasonable suspicion requirement is

3  necessary to safeguard people's rights at the border.

4          THE COURT:  Have any of your members' computers

5  been subject to a border search?

6          MR. PRICE:  Yes.  We discuss one of them at

7  the --

8          THE CLERK:  Microphone, counsel.

9          MR. PRICE:  Yes, your Honor.  And one of them

10  was discussed in detail in the complaint.

11          THE COURT:  Only one?

12          MR. PRICE:  That is what we felt we needed to

13  do at this point.

14          THE COURT:  Okay.  Thank you.

15          THE CLERK:  Counsel, may I get your appearance

16  again for the record.

17          MR. PRICE:  Michael Price.

18          THE CLERK:  Thank you.

19              (Matter concluded)

20                  -o0o-

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **7th** day of **August**, 2011.

*Linda Ferrara*

Linda Ferrara
Transcription Plus II, Inc.