

March 19, 2013

Honorable Edward R. Korman
United States District Judge
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:   *Abidor, et al. v. Napolitano, et al.*, CV-10-4059 (Korman, J.) (Azrack, M.J.)

Dear Judge Korman:

      Pursuant to this Court's February 26, 2013 Order, plaintiffs submit this supplemental letter brief explaining why the Supreme Court's decision in *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013), does nothing to undermine plaintiffs' standing in this case. Far from depending on a "highly attenuated chain of possibilities," *id.* at 1148, plaintiffs have established a sufficient likelihood that their or their members' electronic devices will be searched in the future, just as they have been searched in the past. Moreover, because their future injury is sufficiently likely, the costs and burdens plaintiffs have expended on reasonable precautions to mitigate the damage of future searches are fairly traceable to the policies they challenge.

### I.    The Supreme Court's Decision In *Clapper v. Amnesty*

      *Amnesty* involved a challenge to the FISA Amendments Act of 2008, Pub. L. No. 110-261, 122 Stat. 2436, which permits the Attorney General and the Director of National Intelligence jointly to authorize the surveillance of non-United States persons "reasonably believed to be located outside the United States to acquire foreign intelligence information," 50 U.S.C. § 1881a(a) (2011). To secure an order under § 1881a, the Attorney General and the Director of National Intelligence must obtain approval from the Foreign Intelligence Surveillance Court. *Id.* § 1881a(g)(2)(A)(i). The *Amnesty* plaintiffs included lawyers, journalists, human rights researchers, and others whose work required them to communicate with individuals they believed were likely targets of surveillance authorized by § 1881a. 133 S. Ct. at 1145. They sought a declaration that § 1881a is unconstitutional and an injunction against surveillance carried out pursuant to that section. *Id.* at 1142. The case reached the Supreme Court after the parties cross-moved for summary judgment. *Id.* at 1146, 1148-49.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
WWW.ACLU.ORG

OFFICERS AND DIRECTORS
SUSAN N. HERMAN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

1

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The Court concluded that plaintiffs did not have standing to challenge the FISA Amendments Act. After setting out the broad principles of the Constitution's limits on federal courts' jurisdiction (*viz.*, courts can only adjudicate cases and controversies, plaintiffs must establish standing to file suit), the Court noted that its standing inquiry is demanding when evaluating the constitutionality of actions by other branches of government, and particularly so when intelligence gathering and foreign affairs are involved. *Id.* at 1147.

The Court then focused on the injury element of the standing inquiry. *Id.* It specified that to establish standing, "an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)) (internal quotation marks omitted). The Court acknowledged that "imminence is concededly a somewhat elastic concept," *id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992)), requiring more than a "*possible* future injury," *id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)), but not always a "literally certain" one:

> Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm.

*Id.* at 1150 n.5 (quoting *Monsanto*, 130 S. Ct. at 2754-55; *see also id.* at 1160 (Breyer, J., dissenting) ("[A]s the majority appears to concede, *certainty* is not, and never has been, the touchstone of standing. The future is inherently uncertain. Yet federal courts frequently entertain actions for injunctions and for declaratory relief aimed at preventing future activities that are reasonably likely or highly likely, but not absolutely certain, to take place." (citation omitted)).

The Court held that the *Amnesty* plaintiffs did not have standing based on the likelihood that they would be injured in the future, because any such injury was contingent on five events occurring in sequence:

(1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts.

*Id.* at 1148. Because plaintiffs' theory of standing depended on a "highly attenuated chain of possibilities," the Court held that they lacked standing based on the likelihood of future injury. *Id.*

The Court also held that the *Amnesty* plaintiffs did not have standing based on their *present* injuries, specifically the costs and burdens of avoiding surveillance under §1881a. *Id.* at 1150-51. It reached this conclusion for two reasons. First, because plaintiffs' fear of future injury was too contingent and attenuated to confer standing, they could not "manufacture standing" by "inflicting harm on themselves" through taking on costs and burdens to avoid surveillance. *Id.* at 1151. Second, because plaintiffs' communications could be targeted for surveillance on the basis of other sources of authority in addition to §1881a, there was no reason to believe that §1881a was the cause of the costs and burdens that plaintiffs incurred. *Id.* at 1152. Both of these reasons led the Court to conclude that any present injury suffered by plaintiffs was not "fairly traceable" to §1881a. *Id.* at 1151-52.

## II. *Amnesty* Does Nothing To Undermine Plaintiffs' Standing.

*Amnesty* does not undermine plaintiffs' standing. In contrast to the plaintiffs in *Amnesty*, plaintiffs in this case do not present a claim of future injury that depends on a "highly attenuated chain of possibilities." *Id.* at 1148. In their Complaint, plaintiffs give myriad reasons why their or their members' electronic devices are sufficiently likely to be searched in the future—as they have been in the past. Compl. ¶¶ 55-59, 69-84, 102-119.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Moreover, none of the five reasons the Court gave in *Amnesty* for finding that plaintiffs' claimed future injury was too attenuated is present in this case. Plaintiffs allege that their *own* electronic devices will be targeted—not that their communications will be incidentally swept up when third parties are targeted. *Compare Amnesty*, 133 S. Ct. at 1148 *with* Compl. ¶¶ 55, 84, 119. While there were multiple sources of authority the government could have invoked to target the communications at issue in *Amnesty*, 133 S. Ct. at 1148, the only authorities available to defendants to search plaintiffs' devices absent reasonable suspicion or probable cause are the challenged border search policies. In contrast to *Amnesty*, where the government's ability to intercept communications depended on securing authorization from the FISA Court, *id.*, no intermediary protection stands between defendants and plaintiffs in this case. Moreover, whatever level of difficulty the government encounters in successfully intercepting a communication under § 1881a, seizing and searching an electronic device at the border is a straightforward tangible process. Finally, while the Court raised doubts that the *Amnesty* plaintiffs' own communications would be among those intercepted even if their foreign contacts were targeted, *id.*, it is self-evident that plaintiffs' electronic devices will be filled with their own personal papers.

Relatedly, plaintiffs have not "manufactured" standing by inflicting harm on themselves. Instead, plaintiffs have alleged a sufficiently likely future injury. The costs and burdens plaintiffs have taken on to avoid surveillance, discussed in plaintiffs' Complaint, ¶¶ 62-64, 81, 83, 97, 126, are reasonable precautions in light of defendants' policy and therefore fairly traceable to plaintiffs' future injury.

A few additional points bear mention. For two reasons, plaintiffs' burden to proffer facts sufficient to establish standing is not as high as the burden faced by plaintiffs in *Amnesty*. While *Amnesty* reached the Court on cross-motions for summary judgment, this case is before this Court on defendants' motion to dismiss. "[T]he standard for reviewing standing at the pleading stage is lenient." *Baur v. Veneman*, 352 F.3d 625, 636-37 (2d Cir. 2003).

Also, the *Amnesty* plaintiffs' standing burden was especially demanding because that case involved a highly sensitive and specialized program implicating intelligence gathering and foreign affairs. *Id.* at 1147. Indeed, the program could not be invoked absent a joint authorization by the Attorney General and the Director of National Intelligence. 50 U.S.C. §

4

1881a(a). In contrast, this case involves the government's blanket authorization of its myriad border agents to search any electronic device of any of the 590 million inbound and an unknown number of outbound people whom the government attests cross the border each year.

Plaintiffs briefed standing in this case in March 2011, before the Second Circuit issued its decision in *Amnesty*. Their argument did not depend on *Amnesty* then, and nothing in the Supreme Court's reversal of that decision undermines their standing now.

Finally, even if this Court were to conclude that plaintiffs lack standing to seek facial invalidation of the challenged policies, plaintiff Abidor would plainly have standing to seek return or destruction of the copy of one of more of his electronic devices that the government conceded at oral argument it continues to retain. Oral Arg. Tr. at 31-32. The Second Circuit has been clear that a demand of expungement can be the basis for standing. *Tabbaa v. Chertoff*, 509 F.3d 89, 96 n.2 (2d Cir. 2007).

Respectfully submitted,

/s/ Catherine Crump
Catherine Crump
Hina Shamsi
American Civil Liberties Union

Mason Clutter
National Association of
Criminal Defense Lawyers

Christopher Dunn
Arthur Eisenberg
New York Civil Liberties Union

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION